UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 22-52666 |
| | : | |
| Empire Sports & Entertainment, Inc., | : | Chapter 11 |
| | : | Subchapter V |
| Debtor. | : | Judge Nami Khorrami |

**<u>DECLARATION OF ALEX SCHAFFER IN SUPPORT OF FIRST DAY MOTIONS</u>**

Alex Schaffer declares, under penalty of perjury, in accordance with 28 U.S.C. § 1746:

1.  I am the sole shareholder, director and President of Empire Sports & Entertainment, Inc. ("Empire" or the "Debtor"), a corporation incorporated under the laws of the State of Ohio. Empire is the debtor in this chapter 11 case. I have been the sole shareholder and President of Empire since it was incorporated in 2013 as Al's Ticket Empire, Inc. The articles of the corporation were amended to change the name of the corporation to Empire Sports & Entertainment, Inc. effective January 1, 2017. I am personally familiar with all aspects of its history, financials, and operations.

2.  I am authorized to submit this Declaration on behalf of the Debtor.

3.  Unless otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, review of relevant documents, discussions with Empire's advisors and professionals, or are my opinion, which is based on personal experience and knowledge of the Debtor's operations and financial affairs. If I am called as a witness in this case, I would testify competently to the facts set forth in this Declaration.

4.  I submit this Declaration to assist the Court and parties in interest with understanding the background of the Debtor and the circumstances that resulted in the commencement of this Case. Further, I submit this Declaration to support the Debtor's request for

relief with respect to its (a) voluntary petition for relief under title 11 of the United States Code; and (b) first day motions and applications that are being filed contemporaneously with this Declaration (the "First Day Motions"). This Declaration is referred to as the "Schaffer Declaration" and is incorporated into each of the First Day Motions.

**Debtor's Background and Business Operations**

5. Empire is a ticket reseller and event planner located in Dublin, Ohio. I am presently the only employee of Empire.

6. Prior to the COVID-19 pandemic, Empire operated in two segments. First, Empire was in the business of reselling tickets to sporting events by partnering with online ticket reseller StubHub as well as NCAA schools for the purpose of distributing tickets. Empire built custom software to provide services in analytics, dynamic, machine-based, learning-based pricing and other consulting. For StubHub, Empire operated a software project through a partnership agreement with StubHub to remonetize undervalued tickets on the StubHub website. With the software and StubHub agreement, annual gross revenues increased from about $1.3 million in 2016 to $5.5 million in 2019.

7. The second business segment was providing sports travel and hospitality packages, primarily for Ohio State University football games. Empire had large corporations as customers, and Empire provided tickets, parking, food, beverage, event set-up and management services. In addition, Empire offered travel packages for Ohio State football away games and post-season bowl games. This segment became less of a focus beginning in 2019 when the company focused on its software development.

8. Empire has experienced financial hardship due to several causes. First, from December 2018 through April 2020, I had several surgeries, and I was not involved in the day-to-

day operations during this time. Then in March 2020, the pandemic hit, which shut down the entire industry. As a result of the pandemic, StubHub broke its terms of service, withheld funds from Empire and clawed back funds, which completely destroyed Empire's cash flow, and Empire fell behind on payments to creditors. StubHub was eventually sued by several state attorneys general, including in Ohio, for its practices during the pandemic. Empire essentially suspended its reselling operations due to the pandemic, and its gross revenues in 2021 were only about $47,000.00.

9. In addition to the financial distress caused by the pandemic, in January 2021, StubHub was sold to Eric Baker, its former founder. When this acquisition was finally completed in September 2021, StubHub's entire software infrastructure changed, rendering Empire's software useless unless it is re-tooled. Empire estimates the cost of re-developing the software to be approximately $30,000.00. Empire's plan was to re-develop the software after obtaining financing from the U.S. Small Business Administration ("SBA").

10. The SBA financing, in the total amount of $500,000.00, was approved in September 2021, but the final installment was not received by Empire until August 2022. At that time, however, Empire was being sued by a large creditor, American Express Bank ("AMEX"), and Empire found it necessary to seek bankruptcy protection in order to halt the litigation and resume business operations for the fall 2022 football season.

11. Empire has now resumed operations, although in a manual role without the software. The plan moving forward is to operate with a smaller operation, with just one employee presently, and then to re-tool the software over time, using the services of Empire's former chief technology officer who is now operating an independent software company. Empire's plan also includes resuming on a small scale the sports travel and hospitality business at the end of 2022 or

early 2023. Empire had success with the event planning segment of the business in the past, and profit margins in this area are favorable; however, this will involve hiring additional employees, which will be difficult in today's labor market climate.

## Debtor's Assets and Debt Structure

12. Empire's assets consist of its ticket inventory (the "Inventory"); a small amount of furniture, fixtures, and office equipment (the "FF&E"); its bank account at Huntington National Bank (the "Deposit Account"); its accounts receivable (the "A/R"); and its intangible property (the "Intangibles"). In terms of Intangibles, Empire believes that there is little value to its custom software system now that it is out of date and Empire no longer has a contract with StubHub. Empire also owns certain trademarks of unknown value.

13. Empire's primary secured lender is WebBank, which holds a blanket lien on all of Empire's assets. Empire believes that WebBank is secured by all assets except the Deposit Account, because WebBank did not take the necessary steps to take control of the Deposit Account. The SBA is Empire's second secured lender, and the SBA also claims a blanket lien on all of Empire's assets. Again, Empire believes the SBA is not secured by the Deposit Account because SBA did not take the necessary steps to take control of the Deposit Account.

14. Empire's largest unsecured creditor is AMEX. Empire used credit from AMEX to acquire its Inventory. Other than the large balance owed to AMEX, Empire only has a handful of other unsecured creditors.

## The First Day Motions

15. Through its First Day Motions filed in this Case, the Debtor requests various types of relief in order to permit it to continue to effectively operate its business and, ultimately, maximize the value of its estate. The First Day Motions include the following:

    a.    *Motion of the Debtor for an Order Scheduling Expedited Hearings on Certain First Day Motions* (the "Expedited Hearing Motion");

    b.    *Motion of Debtor for Authority to Continue Use of Existing Bank Account and for Waiver of Investment Guidelines* (the "Bank Account Motion");

    c.    *Motion of Debtor for Authority to (1) Pay Certain Prepetition Employee Compensation and Related Items; (2) Pay Certain Prepetition Payroll Deductions; (3) Pay Prepetition Benefits Under Certain Employee Benefit Plans; and (4) Pay Related Expenses* (the "Wage Motion");

    d.    *Motion of Debtor for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105 and 366 (1) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to the Debtor; (2) Deeming Utility Providers Adequately Assured of Future Performance; and (3) Establishing Procedures to Determine Requests for Adequate Assurance of Payment* (the "Utility Motion"); and

    e.    *Motion of Debtor for Interim and Final Orders (1) Authorizing the Debtor to Use Cash Collateral and to Provide Adequate Protection; and (2) Schedule Final Hearing* (the "Cash Collateral Motion").

16. Having reviewed the First Day Motions, I believe the information they contain is accurate and correct and the relief they seek is necessary to avoid disruption and irreparable harm to Debtor and its estate. Additional information regarding each of the First Day Motions is set forth below.

## Expedited Hearing Motion

17. The relief requested in the First Day Motions is essential to Debtor's operations

and, in turn, its ability to successfully utilize the chapter 11 process. Any delay with respect to the relief requested in the First Day Motions would severely hinder Debtor's ability to preserve and maximize the value of its estate for the benefit of its creditors. Thus, all of the First Day Motions necessitate expedited, emergency hearings.

### Bank Account Motion

18. As set forth in the Bank Account Motion, the Debtor seeks to maintain its existing bank account at Huntington National Bank (the "Bank Account") solely to collect on accounts receivable which will be automatically deposited into the Bank Account. Requiring the Debtor to close this account would cause significant inconvenience and possibly would result in the Debtor being unable to collect certain of its accounts receivable. Allowing the Debtor to maintain the Bank Account will help to ensure uninterrupted business operations.

### Wage Motion

19. As set forth in the Wage Motion, as of the Petition Date, the Debtor owed certain Prepetition Compensation, Deductions and Benefits to its current employees. Any delay in paying such items would seriously harm the Debtor's relationship with its workforce and could irreparably impair employee morale at the very time the dedication, confidence and cooperation of Debtor's employees is most critical. Accordingly, Debtor faces the imminent risk that its operations will be severely impaired if it is not immediately granted authority to make the payments described in the Wage Motion.

20. The Debtor estimates that as of the Petition Date, it owes employees approximately $1,100.00 for earned but unpaid wages, salaries, commissions and other compensation, including applicable payroll taxes and withholdings (the "Prepetition Compensation"). No individual employee is owed more than $13,650.00 in Prepetition Compensation.

21. In the ordinary course of its business, the Debtor provides employees with various employee benefits, including health insurance, paid time off, retirement savings plans, workers' compensation coverage, and other similar programs and miscellaneous benefits (collectively, the "Benefits"). Debtor's monthly outlay for expenses related to the Benefits is approximately $250.00. Interruption of any of the Benefits would harm employee morale and undermine Debtor's efforts to reorganize.

## Utility Motion

22. In the ordinary course of its business, Debtor obtains typical utility services, such as telephone, internet and cell phone service (the "Utility Services") from numerous utility providers (the "Utility Providers"). Ensuring that Utility Services continue without interruption is essential to Debtor's ongoing operations and, therefore, to the success of Debtor's reorganization. If Utility Providers refuse or discontinue service, even for a brief period, Debtor's operations would be negatively impacted. It is therefore critical that Utility Services continue uninterrupted.

23. The Debtor has estimated, as set forth on Exhibit A to the Motion, the monthly charges for each Utility Provider, for a combined average monthly cost of approximately $318.00. The Debtor proposes to make adequate protection payments to the Utility Providers as set forth in Exhibit A to the Motion. The Debtor anticipates continued utilization of Utility Services commensurate with its prepetition usage thereof.

## Cash Collateral Motion

24. As more fully set forth in the Cash Collateral Motion and above, the Debtor contends that the following parties have or may claim to have security interests in the Debtor's cash collateral: (a) WebBank; and (b) SBA (collectively, the "Secured Creditors"). The Debtor intends to grant the Secured Creditors adequate protection with respect to their respective interests

in the cash collateral, if any, by granting such Secured Creditors replacement liens in post-petition cash collateral, to the extent of, and in the same priority as, any valid and subsisting liens or interest held by such Secured Creditors in cash collateral as of the Petition Date.

25. The Debtor does not have sufficient available sources of working capital and financing to operate its business (and fund the Chapter 11 fees and expenses) without the use of the cash collateral. The Debtor has an immediate need to use the cash collateral to, among other things, purchase inventory and pay other routine operating expenses, such as payroll, lease payments, taxes, or other obligations, and to pay fees and expenses related to this Chapter 11 case. In the absence of immediate authorization of the use of the cash collateral, the Debtor cannot continue to operate its business, and immediate and irreparable harm to the Debtor and this estate will occur.

Executed this 9th day of September, 2022

    /s/ Alex Schaffer
Alex Schaffer
Sole Shareholder and President
Empire Sports & Entertainment, Inc.

Respectfully submitted,

    /s/ John W. Kennedy
Myron N. Terlecky (0018628)
John W. Kennedy (0042672)
Strip, Hoppers, Leithart,
McGrath & Terlecky Co. LPA
575 S. Third St.
Columbus, OH 43215
Telephone: (614) 228-6345
Facsimile: (614) 228-6369
E-mail: mnt@columbuslawyer.net
    jwk@columbuslawyer.net
*Proposed Counsel for Debtor*